IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDNA L. VANCE,                          :
                                        :
        Plaintiff                       :
                                        :
v.                                      :
                                        :
ELAINE CHAO, Secretary                  :        Civil Action No. 07-0002 (ESH)
        U.S. Department of Labor,       :
                                        :
        Defendant                       :
                                        :

## **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Edna L. Vance, through counsel, files her opposition to Defendant's

Motion to Dismiss, stating as follows:

1.     Plaintiff's complaint was timely filed; and

2.     Plaintiff's complaint alleges fact sufficient to establish a prima facie case

of retaliation.

The grounds for Plaintiff's Opposition are more fully set forth in the supporting

Memorandum.

Respectfully submitted,

_____/s/_____
Lisa Smith Sanders, Esq.
Bar No. 417142
SANDERS & SANDERS
14452 Old Mill Road, Suite 101
P. O. Box 1429
Upper Marlboro, MD  20773
(301) 574-1338
(301) 574-1435 fax
lisa.sanders@sanderslawfirm.net

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 17th day of July, 2007, the foregoing Opposition, Memorandum of Points of Authorities, and proposed order, were sent in the indicated manner to the following attorney(s) of record:

Via Electronic Notice:

Jeffrey A. Taylor, United States Attorney
Rudolph Contreras, Assistant United States Attorney
Michelle N. Johnson, Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W. – Room E4212
Washington, DC  20530


Via First Class Mail:
David Pena, Senior Attorney Advisor
U. S. Department of Labor
200 Constitution Avenue, N.W.
Washington, DC  20210


                                 ____/s/_____
                                 Lisa Smith Sanders, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDNA L. VANCE,                           :
                                          :
        Plaintiff                         :
                                          :
v.                                        :
                                          :
ELAINE CHAO, Secretary                    :        Civil Action No. 07-0002 (ESH)
        U.S. Department of Labor,         :
                                          :
        Defendant                         :
                                          :

### ORDER

UPON CONSIDERATION of Defendant's Motion to Dismiss and memorandum

in support thereof, Plaintiff's Opposition and memorandum in opposition thereto, any

reply, and the record herein, it is this ___ day of _____, 2007,

ORDERED, that Defendant's Motion to Dismiss is hereby DENIED.


                                        _____
                                        Ellen Segal Huvelle
                                        United States District Court Judge

Copies to:
Lisa Smith Sanders, Esq.
Sanders & Sanders
14452 Old Mill Road, Suite 101
P. O. Box 1429
Upper Marlboro, MD  20773

Michelle N. Johnson
Assistant United States Attorney
Judiciary Center Bldg., Room E4212
555 Fourth Street, N.W.
Washington, DC  20530

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EDNA L. VANCE, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| ELAINE CHAO, Secretary | : | Civil Action No. 07-0002 (ESH) |
| U.S. Department of Labor, | : | |
| | : | |
| Defendant | : | |
| | : | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff, Edna L. Vance, respectfully submits the following Memorandum in Opposition to Defendant's Motion to Dismiss.  Defendant's motion should be denied because (1) Plaintiff's complaint was timely filed in accordance with the applicable rules of procedure, and (2) Plaintiff has pled facts sufficient to state a claim of retaliation entitling her to relief.  Therefore, dismissal is not proper in the instant matter.

**I.    Background**

Plaintiff filed an informal EEO complaint on June 10, 1998, and a formal EEO complaint on September 9, 1998, alleging race and age discrimination against Defendant.  Complaint, at ¶6; Exhibit 1, Complainant's Affidavit.[1]  On May 11, 2000, Plaintiff filed an informal EEO complaint, and on August 25, 2000, a formal EEO complaint alleging reprisal.  Complaint, at ¶8.  Both of these previous EEO complaints became civil actions

---

[1] A copy of Complainant's Affidavit is attached hereto without its original attachments.  A hard copy of the Affidavit with its attachments will be filed separately.

in the U.S. District Court for the District of Columbia.[2]  Plaintiff had been engaged in

discussions to finalize a settlement agreement in the first civil action since October 2000

and continuing through the time of the incidents alleged in this action.  Complaint, at ¶7;

Exhibit 1, Complainant's Affidavit.

The instant civil action arises from Plaintiff's third informal complaint filed on

February 25, 2005, and the formal EEO complaint filed on March 17, 2005, alleging

reprisal for prior EEO activity.  Complaint, at ¶9.  Specifically, Plaintiff's complaint

alleges that OSHA[3] management changed her fiscal year 2004 performance appraisal,

without her knowledge, processed it as her final Rating of Record, and denied her a

performance award for the 2004 appraisal year.  On August 3, 2005, Plaintiff amended

her formal EEO complaint to include continuing harassment and retaliation related to an

adverse performance action.

In May 1999, Plaintiff filed a civil action in U.S. District Court related to the

informal and formal EEO complaints filed in 1998.  Complaint, at ¶7.  In October 1999,

the Justice Department offered to settle the case before it went to trial; however, OSHA

delayed settlement by raising objections to each resolution proposed.  Exhibit 1,

Complainant's Affidavit.  In September 2000, the Justice Department again offered to

settle the case to include assigning Plaintiff to an Interagency Personnel Assignment

(IPA).  Id.  Over the next two years, preliminary agreements were established with two

different organizations to satisfy that part of the settlement agreement because OSHA

insisted that an IPA assignment be completed before it would proceed with any

---

[2] Civil Action No. 99-CV-01178 (AK) and Civil Action No. 02-CV-2480 (GK) respectively.
[3] Occupational Safety & Health Administration (OSHA) is an agency of the U.S. Department of Labor.

settlement.  Id.  In both cases, OSHA delayed settlement by not responding to a related

request for information until both agreements had collapsed.

In June 2003, Plaintiff petitioned the Court to restore proceedings because

settlement had not been finalized.[4]  In July 2003, the Justice Department filed a brief

stating that, in good faith, they would finalize the settlement of the case.[5]  Later in 2003,

a preliminary agreement was established with another organization to satisfy the IPA part

of the settlement agreement.  Again, OSHA delayed settlement by not responding to

related requests for information.  Exhibit 1, Complainant's Affidavit.  Plaintiff petitioned

the Court again in September 2004 for assistance because settlement had stalled.[6]  In

response to Plaintiff's petition, the Court initiated procedures to call a meeting of the

parties in September and October 2004.[7]  Before the meeting could be conducted, OSHA

responded by providing the requested information – a half page of typed information.

This response represented the first real progress in settling the case and the second step

toward removing the one obstacle that OSHA had consistently used to delay settlement.

Since November 2004, OSHA took no further action to finalize the settlement agreement.

Exhibit 1, Complainant's Affidavit.  Subsequently, settlement efforts collapsed and

Plaintiff obtained no relief.  Id.

The instant action arose from actions taken against Plaintiff soon after the

November 2004 settlement collapse.  Complaint, at ¶¶9-10.

## II.    Standard of Review

---

[4] Docket Entry #22, Civil Action No. 99-CV-1178.
[5] Docket Entry #23, Civil Action No. 99-CV-1178.
[6] Docket Entry #26, Civil Action No. 99-CV-1178.
[7] See Docket Report for court action, Civil Action No. 99-CV-1178.

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D. C. Cir. 1987); *Lee v. Geren*, 480 F. Supp. 2d 198, 201 (D.D.C. 2007). All that the Federal Rules of Civil Procedure require of a complaint is that it contain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005)(*quoting Conley*, 355 U.S. at 47). The plaintiff need not plead the elements of a *prima facie* case. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Swierkiewicz v. Sorema N.A., 534 U.S. at 514 (2002)(*quoting Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984)).

Under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. *Leatherman v. Tarrant County Narcotics & Coordination Unit*, 507 U.S. 163, 164 (1993); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C. Cir. 1979). The plaintiff must be given every favorable inference that may be drawn from the allegations of fact. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

### III.     Argument

A.    **Plaintiff's Complaint Was Timely Filed**

Plaintiff received the final agency decision on or about October 2, 2006. Therefore, Plaintiff was required to file her complaint on December 31, 2006. As the deadline fell on a Sunday, Plaintiff then had until the next court business day to file her complaint:

> (a) COMPUTATION. In computing any period of time prescribed or allowed by these rules, by the local rules of any district court, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, **a day on which weather or other conditions have made the office of the clerk of the district court inaccessible**, in which event the period runs until the end of the next day which is not one of the aforementioned days. . . As used in this rule and in Rule 77(c), "legal holiday" includes New Year's Day, . . . **and any other day appointed as a holiday by the President or the Congress of the United States**, or by the state in which the district court is held.

Fed. R. Civ. Proc. 6 (emphasis added).

In this case, the next day on which the court was accessible, i.e. a court business day, fell on Wednesday, January 3, 2007. Defendant correctly states that Monday, January 1, 2007, was a legal holiday. However, the Court was also closed on Tuesday, January 2, 2007, in observance of the funeral services for former President Gerald R. Ford. (See Exhibit 2, Declaration of National Day of Mourning for President Gerald R. Ford and Closing of Federal Offices).[8] Despite the Court's closure on this day, Plaintiff

---

[8] In her motion to dismiss, Defendant asserts that the Court may take judicial notice of "matters of a public nature" without converting its motion to dismiss into one for summary judgment. If such is the case, then

filed her Complaint and accompanying documents in the night drop box on January 2,

2007 (see Exhibit 3, Complaint date stamped "December 33, 2006; Exhibit 4, Civil Cover

Sheet date-stamped "December 33, 2006;" Exhibit 5, Cover letter dated January 2, 2007,

and date-stamped "December 33, 2006").  On the next court business day, these

documents were docketed and logged for January 3, 2007.

Plaintiff did timely file her Complaint.  Therefore, Defendant's Motion to Dismiss

on the grounds that Plaintiff's complaint was untimely should be denied.

### B.    Plaintiff Has Alleged Facts Sufficient to Establish a Claim of Retaliation

To establish a prima facie case of retaliation, plaintiff must show (1) that she

engaged in statutorily protected activity, (2) that the employer took an adverse personnel

action; and (3) that a causal connection existed between the two.  Mitchell v. Baldridge,

759 F.2d 80, 86 (D.C. Cir. 1985)(quoting McKenna v. Weinberger, 729 F.2d 783, 790

(D.C. Cir. 1984).  In the context of a motion to dismiss, the plaintiff need not plead the

elements of the prima facie case.  Swierkiewicz v. Sorema N.A., 534 U.S. at 511-14.

Further, the plaintiff need not prove her case in her complaint.  Scheuer v. Rhodes, 416

U.S. 232, 236 (1974).  The review instead focuses on whether, assuming every the

Plaintiff has alleged in her complaint to be true, Plaintiff has stated a viable claim upon

which relief can be granted.  We say Plaintiff has met this burden.

The parties agree that Plaintiff has engaged in protected activity.  They disagree

regarding whether she has suffered an adverse personnel action that has a causal nexus to

---

Presidential proclamations and court closings are also "public in nature" and may be considered by the
Court.

the earlier discrimination and retaliation complaints.  In the retaliation context, ad adverse

personnel action is defined as one that could conceivably dissuade a reasonable worker

from making or supporting a charge of discrimination.  *See Burlington Northern & Santa*

*Fe Railway Co. v. White*, __ U.S. __, 126 S.Ct. 2405, 2415 (2006); *Rochon v. Gonzales*,

438 F.3d 1211, 1219 (D.C. Cir. 2006).  To be considered adverse, the action must

constitute an "objectively tangible harm," and the defendant's conduct must be judged

"from the perspective of a reasonable person in the plaintiff's position 'considering all

the circumstances.'"  *Brown v. Snow*, 407 F.Supp.2d 61, 65 (D.D.C. 2005)(*citing Oncale*

*v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998).

A downgraded performance appraisal coupled with a loss of performance award,

implementation of a 90-day performance plan (which suggests sub-standard

performance), and unclear performance standards could reasonably be considered an

adverse personnel action.  The loss of monetary award and a significant change in job

responsibilities are a "classic and 'widely recognized' example of 'forbidden

retaliation.'"  *White*, 126 S. Ct. at 2416; *see also Holcomb v. Powell*, 433 F.3d 889, 902

(D.C. Cir. 2006).  Such a harm is not a "purely subjective injury," and may indeed

amount to a "'materially adverse consequence[ ] affecting the terms, conditions, or

privileges of employment or future employment opportunities . . . [which may constitute]

an objectively tangible harm.'"  *Prince v. Rice*, 453 F. Supp.2d 14, 28-29 (D.D.C.

2006)(*quoting Holcomb*, 433 F.3d at 902).

Defendant also suggests that Plaintiff cannot establish a causal connection

between her protected EEO activity and the adverse action complained of in this action.

Plaintiff disagrees. The courts have readily inferred a causal connection when the adverse action "occurs shortly after" the protected activity. *Ball v. Tanoue*, 133 F. Supp.2d 84, 92 (D.D.C. 2001), *citing Garrett v. Lujan*, 799 F. Supp. 198, 202 (D.D.C. 1992). The absence of temporal proximity, however, does not defeat proof of a causal connection; it merely means Plaintiff must show additional evidence linking the adverse action and the protected activity.

Plaintiff can show such evidence. *See* Exhibit 1, Complainant's Affidavit. Even if the Court does not go outside the pleadings, the Court can look to the docket activity in Plaintiff's first civil action to see that a flurry of activity aimed at consummating the purported settlement in that matter occurred just prior to the downgrading of Plaintiff's performance appraisal and her subsequent loss of a performance award. See Civil Action No. 99-CV-1178, Docket Entries ## 22, 23, 26 et seq. While a number of months may separate the filing of Plaintiff's first civil action and the filing of the instant complaint, the activity culminating in the breakdown of settlement efforts in the fall and winter of 2004 lies in close temporal proximity to the downgraded performance evaluation, loss of performance award, implementation of a 90-day performance plan, and imposition of unclear performance standards against which Plaintiff would be judged.

Therefore, evidence supports Plaintiff's contention that there is a causal connection between her prior EEO activity and the downgraded performance evaluation.

It is also well established that there are other "terms, conditions, or privileges" of employment that are susceptible to attack other than simple loss of monetary award. The 90-day performance plan is a corrective measure used to improve perceived weaknesses

in performance.  Being identified as having weak performance, coupled with being held to standards and objectives she could not meet with her current assignment, Plaintiff found herself effectively stonewalled from further advancement.

The loss of promotion opportunities, prestige, and exposure constitute a tangible harm to the terms, conditions, and privileges of one's employment.  *Little v. O'Neill*, EEOC No. 01A04887, 2001 EEOPUB LEXIS 1312, at 2 (March 8, 2001) (opportunity to enhance work skills through high profile assignments is a tangible denial of terms, conditions, and privileges of employment); *Osborne v. Daley*, EEOC No. 01971394, 1997 EEOPUB LEXIS 4100, at 3 (failure to respond to inquiries concerning employment status and promotional opportunities after reassignment of duties caused complainant to suffer harm); see *Wainwright v. Rubin*, EEOC No. 01951199, 1996 EEOPUB LEXIS 4522, at 3 (September 25, 1996)(loss of prestige is a present loss sufficient to constitute an adverse action).

Therefore, Plaintiff is clearly an aggrieved employee and has adequately stated a claim upon which relief may be granted.  Therefore, dismissal is inappropriate.

## IV.    CONCLUSION

Based on the foregoing, Plaintiff requests that Defendant's Motion to Dismiss be denied and that she be granted such other relief as the Court deems appropriate.

Respectfully submitted,


_____/s/_____
Lisa Smith Sanders, Esq.
DC Bar No. 417142
SANDERS & SANDERS
14452 Old Mill Road, Suite 101
P. O. Box 1429
Upper Marlboro, MD  20773
(301) 574-1338
(301) 574-1435 fax
lisa.sanders@sanderslawfirm.net

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of July, 2007, the foregoing Opposition, Memorandum of Points of Authorities, and proposed order, were sent in the indicated manner to the following attorney(s) of record:

Via Electronic Notice:

Jeffrey A. Taylor, United States Attorney
Rudolph Contreras, Assistant United States Attorney
Michelle N. Johnson, Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W. – Room E4212
Washington, DC  20530


Via First Class Mail:
David Pena, Senior Attorney Advisor
U. S. Department of Labor
200 Constitution Avenue, N.W.
Washington, DC  20210


____/s/_____
Lisa Smith Sanders, Esq.

*Complainant Questionnaire*
*Case Nos. 05-11-077, Edna L. Vance, Complainant*

## COMPLAINANT'S AFFIDAVIT

I, (name) Edna Lillian Vance

am an  **X**  employee of ____ applicant to ___ former employee of the U.S. Department of Labor's:

(Agency)  Occupational Saftey & Health Administration

(Office)  Directorate of Evaluation and Analysis

(Division)  Office of Statistical Analysis

(Branch)  Division of Statistical Design, Evaluation and Quality Management

Located in (city and state)  Washington, D.C.

In the capacity of (show both your organization title and the classification of your job, if different):

Program Analyst

Grade  GS-14  between (date)  1972  and (date)  present

My telephone number during working hours is:  (202) 693-1879

I HAVE BEEN ADVISED OF THE FOLLOWING:

I have an obligation to cooperate fully with the investigator who has been assigned to conduct an impartial and appropriate investigation of my complaint of discrimination. Therefore, I must provide a statement for the investigative record that is true and complete to the best of my knowledge and belief and fully addresses the issues accepted for investigation. My statement must be specific with regard to names, dates, places, circumstances and related events, and disclose my firsthand knowledge of any directly related information that is relevant to the issue(s). My statement, along with my Informal Complaint, Counselor's Summary Report, Formal Complaint, and the "issue accepted for investigation" shall serve as the basis of the investigation. While I may voluntarily submit any additional documents or information to the investigator for consideration, it will be the investigator's responsibility to determine what evidence shall actually become part of the investigative report. If there are any documents or facts that substantiate my allegations, I must provide them to the investigator, or make them known to the investigator. I may suggest witnesses to be interviewed by the investigator. However, the investigator will decide which witnesses to interview based on relevant information he or she feels will be furnished.

My statement is made under oath (or affirmation), without a pledge of confidentiality, in accordance with the rules, regulations, policies, and procedures of the Equal Employment Opportunity Commission and the Department of Labor. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown this statement or relevant portions and be given an opportunity to respond. Agency officials responsible for processing complaints of discrimination will have access to the entire investigative report. If discrimination is found, any employee accused of discrimination will have an opportunity to review a sanitized version of the report. If discrimination is found and disciplinary action is proposed, the employee accused of discrimination will have an opportunity to review the report in its entirety without deletions. Participants in the discrimination complaint process are specifically protected by law and the EEO regulations from any acts of reprisal, discrimination, coercion, harassment, restraint, or inference for their participation in the investigation and other phases of complaint processing.

I have the right to be represented by a person of my choice during presentation of my complaint and preparation of my statement (so long as my choice does not result in a conflict of interest).  I have/have not  chosen a personal representative at this stage of my complaint. In the event I have not chosen a representative but later obtain a representative at a later date, I will advise the investigator and the Director of the Civil Rights Center in writing.

I have the right to review my statement prior to signing it, and may make initialed corrections if it is incomplete or inaccurate. I have a right to receive a copy of the signed statement.

Having reviewed the preceding information with the investigator, I solemnly swear or affirm that the statement to follow is true and complete to the best of my knowledge and belief, and fully addresses the issues and allegations raised by me in my EEO complaint.

CRC Form 10
Rev. 3/03

```
Exhibit:      F-1
Page    1   of 14 Pages
```

Initials: _EV_

SUPPLEMENTAL REPRISAL AFFIDAVIT OF EDNA LILLIAN VANCE

This supplemental affidavit responds to requests for information related to my amended EEO Reprisal Complaint of August 3, 2005 (Attachment A), as outlined in the EEO Investigator's communication of September 13, 2005 (Attachment B). Many of the attachments to this supplement are identical to those provided with my initial affidavit of September 13, 2005. The attachments here are identified alphabetically. Attachments to my September 13 affidavit are identified numerically. Information in my initial affidavit may be included here by reference. Also, the dates in this supplemental affidavit may differ slightly from dates identified in the September 13 affidavit; the dates that appear in this affidavit have been verified and may therefore be regarded as correct.

1.    *"Please state for the record your full name."*

> **Response**:    My name is Edna Lillian Vance.

> **Background**.    I have been employed with the Occupational Safety and Health Administration (OSHA), U.S. Department of Labor (DOL) since 1972. I am a GS-14 Program Analyst. I filed an Informal EEO Complaint on June 10, 1998, and a Formal EEO Complaint on September 9, 1998, alleging race and age discrimination. On May 11, 2000, I filed an Informal EEO Complaint, and on August 25, 2000, a Formal EEO Complaint alleging reprisal. Both of these previous EEO complaints became civil actions in the U.S. District Court for the District of Columbia. Through legal counsel, I have been engaged in discussions to finalize a settlement agreement in the civil action since October 2000. I filed my current Informal EEO Complaint on February 25, 2005, and my Formal EEO Complaint on March 17, 2005, alleging reprisal for my prior EEO activity when OSHA management changed my Fiscal Year 2004 (2004) performance appraisal, without my knowledge, and processed it as my final Rating of Record, and denied me a performance award for the 2004 appraisal year. On **August 3, 2005**, I filed an amendment to my February 25, 2005, Informal EEO Complaint alleging continuing harassment and retaliation related to an adverse performance action.

> In May 1999, I filed a Civil Action in U.S. District Court related to the Informal and Formal

EEO Complaints I filed with DOL in 1998. This court case has been going on for more than six years even though there was an agreement to settle in 1999. In October 1999, the Justice Department offered to settle the case before it went to trial. OSHA delayed settlement by raising objections to every solution proposed, even though their objections were unfounded. In May 2000, the Court was petitioned to continue discovery proceedings and to schedule trial. In September 2000, the Justice Department, again, offered to settle the case to include assigning me to an IPA. Over the next two years, preliminary agreements were established with two different organizations to satisfy that part of the settlement agreement because OSHA insisted that an IPA assignment be completed before it would proceed with any settlement. In both cases, OSHA delayed settlement by not responding to a related request for information until both agreements had collapsed. In either case, I believed, OSHA's response would have taken less than two hours to prepare. In October 2002, the Court was petitioned to restore proceedings because settlement could not be reached. In November 2002, the Justice Department filed a brief stating that, in good faith, they would settle the case. In 2003, a preliminary agreement was established with another organization to satisfy the IPA part of the settlement agreement. Again, more than 1½ years, OSHA delayed settlement by not responding to a related request for information. The Court was petitioned again in October 2004 to restore proceedings because settlement had stalled. In response to this petition, the Judge initiated procedures to call a meeting of the parties. Before the meeting could be scheduled, OSHA responded in November 2004, by providing the requested information -- a half page of typed information. This response represented the first real progress in settling the case and the second step toward removing the one obstacle that OSHA had consistently used to delay settlement. Now, OSHA had no reason not to move forward with settlement. It should be noted that, since November 2004, OSHA has taken no further action to finalize the settlement agreement and has not responded to any inquiries from my counsel.

2.    *"You allege that you were rated Highly Effective on your performance appraisal after being placed on a 90-Day Performance Plan because of your prior EEO activity. Please respond to the following questions. Please be as specific as possible describing circumstances, providing facts (i.e. dates, names, titles, places, etc.). In as much detail as possible and in a time*

*sensitive chronology. Please submit available documentary evidence to corroborate your testimony."*

a.  *"Exactly who provided you with the appraisal at issue?"*

**Response**:

Joseph DuBois signed the appraisal at issue on July 20, 2005, as Rating Official and Robert Pitulej signed on July 27, 2005, as Reviewing Official (Attachment C).

Mr. DuBois is my supervisor and the Director of the Office of Statistical Analysis, Directorate of Evaluation and Analysis (DEA).  Mr. DuBois signed my pervious three (3) performance appraisals in his current capacity.  Mr. Pitulej is Deputy Director of DEA. He officially joined DEA the week of December 6, 2004, although he had been briefed and physically moved to the directorate weeks earlier (Attachment D).  Previous to December 2004, Mr. Pitulej was the Deputy Director of OSHA's Directorate of Cooperative and State Programs.

b.      *"What exactly occurred or was said?  What was the rating period?  What was the summary rating?  (Provide a copy of any relevant documentation.)"*

**Response**:

On **December 1, 2004** (around 2:30 p.m.), Joseph DuBois, stopped at my desk and presented me with my 2004 performance appraisal (Attachment E).  The appraisal reduced my overall performance rating from Outstanding the previous years, to Highly Effective.  When Mr. DuBois handed me the appraisal, he commented that, "Frank [Frodyma, Deputy Director, Directorate of Evaluation and Analysis] said he's not giving out a lot of outstandings this year."  Mr. DuBois provided no further explanation of his appraisal of my performance.  Mr. Frodyma was the Reviewing Official on December 1, 2004, and had already signed other appraisals in the directorate in this capacity.  Mr. DuBois' previous three appraisals rated my performance as Outstanding (Attachment F).  (See my Affidavit of September 13, 2005, pages

4-8, for more information.)

On **December 3, 2004**, while I was on approved leave, Clay Taylor, a Local 12 Union Representative in the Directorate of Evaluation and Analysis (DEA), met with Keith Goddard and Robert Pitulej (Director and Deputy Director, DEA) in a 'good faith' effort to resolve issues related to my 2004 performance appraisal. Ms. Taylor related three concerns, the appraisal was on the wrong form, I had no approved standards and elements in place in 2004, and the inconsistent rating of the same performance statement. To resolve these issues, Ms. Taylor recommended putting me under 90-day standards and elements, developing a new appraisal at the end of that period to include 2004 performances, and rating my performance as Outstanding. According to Ms. Taylor, Keith Goddard and Robert Pitulej were receptive and she felt that they were going to follow through on her recommendations. They promised to report back to her; they never did. DOL Personnel Regulations (Chapter 430, Section 7. Appraisal of Performance) provide that, "If an employee has not been under a performance plan for the minimum 90-day appraisal period by the end of the cycle, the rating official will extend the appraisal period and rate the employee after 90 days under the plan." This 90-day extension can only be applied in September or at the end of the appraisal cycle, it is not an option at any other time. This option could not be applied in my case, because we were already about 2 ½ months into the next appraisal cycle. Also, DOL Personnel Regulations are clear that appraisals reflect tasks completed during the time covered by the Performance Plan. Including 2004 tasks in a 2005 appraisal would not be appropriate.

On **December 6 or 7, 2004**, while I was on approved leave, I took a call at my home from my supervisor, Mr. DuBois. He said that Keith [Goddard] told him to call me and tell me that my [2004] appraisal was on the wrong form and was put on the right form, that there were no changes, that my rating was still Highly Effective, and that if I did not sign the appraisal it would become final. I reminded Mr. DuBois that I was on leave. I asked Mr. DuBois if my rating was still Highly Effective because Frank said he's not giving out a lot of outstanding [ratings]. He changed his story and said that it was Keith [Goddard] who told him that, not Frank [Frodyma]. When my appraisal was given to me on December 1, 2004, Frank Frodyma was Reviewing Official and had already signed other employee appraisals of the directorate in

that capacity. Mr. Frodyma left the Deputy Director position effective December 4, 2004. Mr. Goddard joined OSHA in June 2004. In November 2004, I worked closely with him on the Recordkeeping Handbook.

I was the only person in my division whose overall performance rating was reduced based on a decision by OSHA management. I believe this action was an act of retaliation and reprisal for my participation in past protected activity and my unwillingness to drop my current civil action. OSHA management's goal was to reduce my overall performance rating; they were not concerned that they broke or violated the rules or regulations in the process. I understand that OSHA management often uses "bad manager" or "bad management" to excuse or cover planned activity.

On **January 24, 2005**, when I returned to work, I found a copy of my 2004 performance appraisal on my desk (Attachment G), and discovered that it had been altered, without my knowledge. Management had created a new appraisal by changing the rating for Element 5 from Exceeds to Meets to support an earlier management decision to reduce my overall performance rating from Outstanding the previous years, to Highly Effective. The appraisal was then processed as my final Rating of Record while I was on approved leave. For the past three years my performance has been rated Outstanding. Nonetheless, I believed this appraisal was OSHA's official appraisal of my performance for 2004. It had been signed by the Rating Official and approved by the Reviewing Official. I believed this even though there were questions about the appraisal's validity. I also believed that the lowering of my overall performance rating to Highly Effective was an act of reprisal for my past participation in protected activity, and my unwillingness to drop my current civil action.

When Mr. DuBois signed the appraisal, he knew he had not established the basis for appraising my performance for 2004. In the section 'Establishment of the Performance Management Plan,' there was no signature or date indicating that Mr. DuBois' elements and standards had been reviewed and approved by the Reviewing Official. In fact, I was never presented with elements and standards for 2004. DOL Personnel Regulations (Chapter 430, Section 6. Performance Plan) provide that, ". . . the Rating Official prepares a performance plan annually

for each employee, have them reviewed by a higher level official and communicate the plans to each employee. The plans become effective and the appraisal period begins at the time the plans are approved by the Reviewing Official."

On **January 25, 2005**, one day after I returned from approved leave and found a copy my 2004 appraisal on my desk, I was presented with a 90-day Performance Plan by my supervisor, Joseph DuBois (Attachment H). Mr. DuBois stated that the OSHA Personnel Office said I needed to be put on a 90-day plan because I did not sign my [2004] performance appraisal. I reminded Mr.Dubois that I was on approved leave at the time. He explained that a new standard and element had been added to the 90-day plan to cover the project I volunteered to do for John Smith. I reminded Mr. DuBois that Mr. Goddard had asked me to do the project and that I do not refuse assignments. Mr. DuBois did not explain his 90-day elements and standards.

The appraisal period for the 90-day Performance Plan was identified as January 24, 2005 to April 30, 2005. There were no signatures or dates on the plan, and, except for the one new element and standard related to development of the field audit handbook [John Smith's project], the remaining elements and standards were identical to those of my 2004 and 2003 performance appraisals (Attachments F and G).

As a manager and supervisor with many years of experience, Mr. DuBois knew that the reason the Office of Personnel cited for putting me under a 90-day Performance Plan was not a valid reason. He knew that employees do not have to sign their performance appraisals for them to become final. DOL Personnel Regulations (Chapter 430, Section 6. Performance Plans) provide that, "Rating Officials prepare performance plans and communicate them to the employees at the beginning of each performance appraisal cycle. New or revised performance plans are required if duties, responsibilities, resources or priorities change significantly. If an employee has not been under a performance plan for the minimum 90-day appraisal period by the end of the cycle, the rating official will extend the appraisal period and rate the employee after 90 days under the plan."

Mr. DuBois knew when he presented me with the 90-day Performance Plan that I would question this action. On January 25, 2005, I consulted with Local 12 Union Representative Linda Copening of the Employment Standards Administration (ESA). She explained the regulations governing appraisals and performance plans. Over the next week, Ms. Copening made a number of calls to OSHA's Personnel Director, Doug Goodell, to get some answers. None of her calls were returned. When she finally accosted Mr. Goodell in the hall, he said he was told that the 90-plan was because I was under standards and elements for only part of the year. When Ms. Copening asked what that meant, he did not respond. Mr. Goodell promised to look into the matter.

On **February 10, 2005**, Mr. DuBois presented me with a revised 90-day Performance Plan (Attachment I). I sent Mr. DuBois an e-mail confirming the reason I was being put under a 90-day plan (Attachment J). He did not respond to my email. There were no signatures or dates on the plan, and all of the elements and standards were identical to the elements and standards of my 2003 and 2004 performance appraisals (Attachments F and G). The appraisal period was February 7, 2005 to May 9, 2005. Mr. DuBois stated that the new element and standard on the handbook had been deleted. However, he did not explain his 90-day elements and standards (see my Affidavit of September 13, 2005, for more information).
DOL Personnel Regulations (Chapter 430, Section 6. Performance Plans), provide that, "Rating Officials prepare performance plans and communicate them to the employees at the beginning of each performance appraisal cycle. New or revised performance plans are required if duties, responsibilities, resources or priorities change significantly. If an employee has not been under a performance plan for the minimum 90-day appraisal period by the end of the cycle, the rating official will extend the appraisal period and rate the employee after 90 days under the plan."

On **February 24, 2005**, I returned the revised 90-day Performance Plan to Mr. DuBois (Attachment I). My comments were attached (Attachment I).

OSHA Management had no valid reason for placing me under a 90-day Performance Plan. In fact, the official DOL personnel computer system (People Power) identified my next Review Date as 09/30/05 (Attachment K). I was the only one in my division put on a 90-day plan, and,

I believe, the only one in my directorate. Clay Taylor, a Program Analyst of the Directorate of Evaluation and Analysis (DEA), did not sign her appraisal and she was not put on a 90-day plan. OSHA management's ultimate goal in putting me under a 90-day plan was to reduce my overall performance rating to support their earlier decision; they were not concerned that they broke or violated the rules or regulations in the process. I understand that OSHA management often uses "bad manager" or "bad management" to excuse or cover planned activity.

On **March 7, 2005**, my supervisor, Mr. DuBois, stopped at my desk and presented me with a signed and dated copy of his 90-day Performance Plan for me (Attachment L). My comments were attached to the front of the plan. He stated that I would be under these elements and standards for the next 90-days. The plan covered the period of time from March 1, 2005 to June 1, 2005. Mr. DuBois signed the plan as Rating Official and Robert Pitulej signed as Reviewing Official. Mr. DuBois did not explain his standards and elements, provide any assignments or discuss his expectations over the 90-day period.

On **March 8 or 9, 2005**, I went to Mr. DuBois and asked if he had any assignments for me. He explained that OSHA was collecting data on immigrant/Hispanic fatalities that needed to be looked at. He gave me some background on why and how the data was being collected. He did not explain his expectations or give me a timetable. I suggested that I could start looking at the data along the same line as the logging fatality data I reported on several years ago. I reminded him that the logging fatality report was based on 104-108 cases, not the roughly 1,000 immigrant/Hispanic cases that now exist. While the logging report took several years to develop, a report on 1,000 immigrant/ Hispanic case files could take considerably longer. Mr. DuBois confirmed that I would need to review each immigrant/Hispanic fatality case file and manually collate the information. Mr. DuBois provided me with national and regional data, but no individual case data. My performance on the logging report was rated as Outstanding.

On **April 26, 2005**, when I was convinced that I would not receive any additional information from Mr. DuBois on Immigrant/Hispanic fatalities, I developed and presented him with several copies of a preliminary report reflecting the information he had provided -- the OSHA Immigrant/Hispanic Questionnaire with two years of responses, and an analysis with support

graphics and tables representing his data and other research information (see my Affidavit of September 13, 2005, Attachment 15). Mr. DuBois told me that he planned to arrange a meeting with Tom Galassi, Deputy Director of Enforcement Programs, to go over my materials and get some feedback on their usefulness for distribution to OSHA field offices. I assumed I was to be a part of that meeting. Mr. DuBois told me not to do any additional work on the data until we got feedback from Mr. Galassi. I asked Mr. DuBois almost every day for about two weeks whether he had arranged a meeting with Mr. Galassi, and he said no. I stopped asking, and I have gotten no feedback. I have also not received any additional data or assignments from Mr. DuBois.

On **July 20, 2005**, Joseph DuBois stopped at my desk and presented me with his appraisal of my performance for the 90-day period, March 1, 2005 - June 1, 2005 (Attachment M). He had signed and dated the appraisal as Rating Official. He did not explain his appraisal of my performance. On page 1, he did not check either block under Performance Appraisal and Rating to indicate his overall rating of my performance, and on page 2, he did not indicate the Purpose of Appraisal, i.e., Interim Rating or Rating of Record.

On **July 26, 2005**, I returned the appraisal with my comments (Attachment N).

When Mr. DuBois presented me with the appraisal on July 20, 2005, more than 30 days had expired since June 1, 2005, the end of the review period. DOL Personnel Regulations (Chapter 430, Section 7. Appraisal of Performance) provide that, "Within 30 days after the end of the rating period, each employee normally will receive an annual performance rating of record." Article 14 (Performance Management System), Section 5 (Annual Rating of Record) of the Agreement Between Local 12, AFGE, AFL-CIO and the U.S,. Department of Labor (effective March 20, 2005) provides that, ". . . The rating may be completed 30 days prior to the due date but not later than 30 days after the due date."

On **July 27, 2005**, the Reviewing Official, Robert Pitulej, signed the appraisal approving the Rating Official's assessment of my performance for the period of March 1, 2005 - June 1, 2005.

**On August 1, 2005,** I discovered a copy of the approved appraisal on my desk (Attachment C). My comments and a copy of my February 10, 2005, email confirming the reason for the 90-day Performance Plan, were attached. As the appraisal indicates, no mid-term progress review was conducted during the rating period, my performance rating was checked as Highly Effective, and the Purpose of Appraisal (Interim Rating or Rating of Record) was not indicated.

Mr. DuBois rated my overall performance as Highly Effective in continued support for management's earlier decision to reduce my rating. He did not explain his appraisal of my performance. At no time during my interaction with Mr. DuBois over the 90-day period, did he ever discuss my performance or how it related to the elements and standards. For Elements 3 and 4, Mr. DuBois rated my performance based on tasks that I completed in 2004. For Elements 2 and 5, Mr. DuBois rated my performance Meets and chose not to include a statement. Because Mr. DuBois did not discuss his assessment of my performance as it related to these elements, I have no idea what I did or did not do or how I might improve. More important, Mr. DuBois had no valid basis for rating my performance for the 90-day period, because management had no valid reason for putting me under and 90-day Performance Plan on March 1, 2005. Moreover, management knew this fact, and, therefore, refused to indicate on the appraisal whether it represented an Interim Rating or a Rating of Record.

**Background.**    In May 1999, I filed a Civil Action in U.S. District Court related to the Informal and Formal EEO Complaints I filed with DOL in 1998. This court case has been going on for more than six years even though there was an agreement to settle in 1999. In October 1999, the Justice Department offered to settle the case before it went to trial. OSHA delayed settlement by raising objections to every solution proposed, even though their objections were unfounded. In May 2000, the Court was petitioned to continue discovery proceedings and to schedule trial. In September 2000, the Justice Department, again, offered to settle the case to include assigning me to an IPA. Over the next two years, preliminary agreements were established with two different organizations to satisfy that part of the settlement agreement because OSHA insisted that an IPA assignment be completed before it would proceed with any settlement. In both cases, OSHA delayed settlement by not responding

to a related request for information until both agreements had collapsed. In either case, I believed, OSHA's response would have taken less than two hours to prepare. In October 2002, the Court was petitioned to restore proceedings because settlement could not be reached. In November 2002, the Justice Department filed a brief stating that, in good faith, they would settle the case. In 2003, a preliminary agreement was established with another organization to satisfy the IPA part of the settlement agreement. Again, more than 1½ years, OSHA delayed settlement by not responding to a related request for information. The Court was petitioned again in October 2004 to restore proceedings because settlement had stalled. In response to this petition, the Judge initiated procedures to call a meeting of the parties. Before the meeting could be scheduled, OSHA responded in November 2004, by providing the requested information -- a half page of typed information. This response represented the first real progress in settling the case and the second step toward removing the one obstacle that OSHA had consistently used to delay settlement. Now, OSHA had no reason not to move forward with settlement. It should be noted that, since November 2004, OSHA has taken no further action to finalize the settlement agreement and has not responded to any inquiries from my counsel.

On December 1, 2004, OSHA management made a decision to reduce my overall performance rating from Outstanding of previous years, to Highly Effective, and to deny me a 2004 performance award. They made these decisions and took these actions even though they knew they were in violation of DOL regulations. Moreover, in their determination to document a lower performance rating for me, they developed three (3) different appraisals for me over an eight-month period. These actions were acts of retaliation and reprisal for my past participation in protected activity and my unwillingness to drop my current civil action.

So many years have expired since I filed my case in 1998. Therefore, many other managers and employees have gained some knowledge of my case simply through word of mouth. In addition, since June 1998, a number of OSHA managers and employees have gained knowledge of my EEO case and activities because they have been involved with or impacted by the processes. In 1999, the Justice Department interviewed and met with a number of OSHA managers about my civil action. When I filed my EEO Reprisal Complaint in August 2000, a

number of managers were part of the investigation.  In September 2000, a number of managers and employees were identified and scheduled for depositions in my civil action.  So far, I believe, the settlement negotiations of my case have directly involved the Director and Deputy Director of the Directorate of Administrative Program, the Director and staff of OSHA's Office of Personnel, and the Office of the Assistant Secretary for OSHA.  I also believe the top management of my directorate is kept informed of all activity related to my case.

c.      *"Do you agree with the basis for the rating?"*

**Response**:

OSHA management had no valid reason for putting me under a 90-day Performance Plan on March 1, 2005, and therefore, no valid basis for rating my performance in July 2005.  DOL Personnel Regulations (Chapter 430, Section 6. Performance Plans) provide that, "Rating Officials prepare performance plans and communicate them to the employees at the beginning of each performance appraisal cycle.  New or revised performance plans are required if duties, responsibilities, resources or priorities change significantly.  If an employee has not been under a performance plan for the minimum 90-day appraisal period by the end of the cycle, the rating official will extend the appraisal period and rate the employee after 90 days under the plan."

When OSHA Management processed the 2004 appraisal for me in December 2004, they established the next appraisal date as September 30, 2005.  The official DOL personnel computer system (People Power) confirmed this date (Attachment K).  Further, as a manager and supervisor with many years of experience, Mr. DuBois knew that the reason the Office of Personnel cited for putting me under a 90-day Performance Plan was not a valid reason.  He knew that employees do not have to sign their performance appraisals for them to become final.  Clay Taylor, a Program Analyst in the Directorate of Evaluation and Analysis (DEA), did not sign her appraisal and she was not put on a 90-day plan.

d.      *"If no, for each element rating of your appraisal that you disagree with, what rating do you think you should have received and provide justification (including*

*documentary evidence to corroborate your testimony) as appropriate.*"

**Response**:

OSHA management had no valid reason for putting me under a 90-day Performance Plan on March 1, 2005, and, therefore, no valid basis for rating my performance in July 2005.  In taking these actions, OSHA management ignored DOL Personnel Regulations (Chapter 430, Section 6. Performance Plans) that provide that, "Rating Officials prepare performance plans and communicate them to the employees at the beginning of each performance appraisal cycle.  New or revised performance plans are required if duties, responsibilities, resources or priorities change significantly.  If an employee has not been under a performance plan for the minimum 90-day appraisal period by the end of the cycle, the rating official will extend the appraisal period and rate the employee after 90 days under the plan."

e.    *"Exactly when did you receive the rating of issue?"*

**Response**:

On **July 20, 2005**, at 4:20 p.m., Joseph DuBois stopped at my desk and handed me his appraisal of my performance for the period of March 1, 2005 to June 1, 2005 (Attachment M).  He did not explain his appraisal of my performance.

On **July 26, 2005**, I returned the appraisal with my written comments (Attachment N).  The appraisal was approved by the Reviewing Official, Robert Pitulej, on July 27, 2005.  The appraisal was overdue.  Article 14 (Performance Management System), Section 5.a. (Annual Rating of Record) of The Agreement Between Local 12, AFGE, AFL-CIO and the U.S. Department of Labor (effective March 20, 2005), provides that, ". . . ratings may be completed 30 days prior to the due date but not later than 30 days after the due date."

On **August 1, 2005**, a copy of the approved appraisal was left on my desk, and I discovered it around 9:30 or 10:00 a.m.

f.      *"How has the rating at issue affected you?  Has your employment and/or job
performance been affected in any way?"*

**Response**: Yes.

OSHA's determination to reduce my performance rating has caused me a lot of stress and
anxiety, affecting my well-being and my health.  The stress and anxiety arises from my fear that
OSHA will try to use the reduced rating to renege on the purported settlement agreement
reached in the civil action.  In addition, I have grave concerns that this act, along with OSHA'S
continued prolonging of ratifying the settlement, is just the beginning of OSHA's intensification
of efforts to force me to drop my civil action and the 6-year old settlement we had supposedly
reached.  Over an eight-month period OSHA produced three (3) different appraisals of my
performance, and in each case rated my performance down.  These ratings were never
discussed with me and I was never given an opportunity to improve.  I am no longer confident
in my performance.  I spend a lot of time changing things because I no longer know what I am
doing right or what I am doing wrong.  I no longer know whether I am producing Outstanding/
Exemplary work, or just acceptable work.  Because management ignored the regulations in
taking these actions against me, I am nervous as to what they will do next.  This nervousness
cases me to eat constantly, and I have regained the weight I lost two years ago.

I am embarrassed by what management has done to me.  I know of no one in my division, or
office whose performance was reduced at management's direction, whose appraisal was
modified without their knowledge and finalized, whose performance award was canceled, and
whose performance rating was reduced in the middle of the year based on a 90-day
Performance Plan that was directed by the Office of Personnel.  All of these actions were done
without any discussions with me.  Co-workers I have talked with find it difficult to believe
management would do such things.  They see me as a good employee, and question why bad
employees are treated better.  They empathize with my struggles to deal with management's
actions, and they feel sorry for me.  I am embarrassed that I have not been able to stop these
actions against me.

I am angry that management has singled me out for punishment because I exercised my rights to participate in a protected activity. Equal Employment Opportunity is the law, and individuals who point out violations of the law are supposed to be protected by the law. I am angry that these actions were allowed to happen to me, and that management continues to feel free to take actions in harassment, retaliation and reprisal. I am angry that I am often looked upon as the bad guy.

Management knew that the impact of its decision would cause me financial harm. Everyone knows that employees with less than Outstanding/Exemplary performance ratings do not get jobs and promotions. In addition I have been deprived of the higher performance awards and the increase in salary from Quality Step Increases.

g.    *"What, other reasons, if any, were you given for the rating?"*

**Response**:

On **December 1, 2004**, Joseph DuBois told me, when he stopped at my desk and handed me my 2004 appraisal, that Frank Frodyma, the Deputy Director, made the decision to reduce my overall performance rating from Outstanding the previous years, to Highly Effective.

On **December 6 or 7, 2004**, Joseph DuBois told me, when he called me at home while I was on approved leave, that Keith Goddard, the Director, made the decision to process a Highly Effective rating for me while I was on approved leave.

On **January 25, 2005** and **February 10, 2005**, Joseph DuBois told me when he stopped at my desk and handed me his 90-day Performance Plan that the Personnel Office directed that I be put on a 90-day Performance Plan in January 2005, which resulted in a Highly Effective rating in July 2005.

h.    *"Are you aware of anyone else in your office that has been similarly rated?"*

**Response**:

No, I am not aware of anyone in my division or office who was put on a 90-day Performance Plan by the OSHA Personnel Office for not signing their 2004 appraisal, and whose subsequent performance rating was reduced from Outstanding of previous years, to Highly Effective to support an earlier management decision.

i.      *"Who specifically do you believe discriminated against you in this matter and how?"*

**Response**:

I believe OSHA management discriminated against me.

When Frank Frodyma made the decision, as a manager, to reduce my overall performance rating from Outstanding the previous years, to Highly Effective, the decision was supported by other managers even though they were aware that it violated DOL Personnel Regulations. I had no direct interaction with Mr. Frodyma on assignments. When my 2004 appraisal was changed without my knowledge and processed as my final Rating of Record, other managers participated in the process, including the Director of Personnel who accepted and processed the appraisal even though there was clear physical evidence that it was in violation of DOL Personnel Regulations. When the OSHA Personnel Office directed that I am put on a 90-day Performance Plan for not signing my 2004 appraisal, and when my performance was then rated down without any discussions or meetings with me, OSHA managers supported these actions even though they knew they were in violation of DOL Personnel Regulations.

All of these managers had some level of knowledge of my EEO case or activity. The Director of Personnel is a central figure in OSHA in the settlement negotiations related to my case because of the nature of the issues to be resolved. I believe he knows a great deal about my case. The personnel-related document that was produced by OSHA in November 2004 as part of my settlement negotiations was probably developed under the supervision of the Director of

Personnel. In his position as Acting Director and Deputy Director of the directorate, Frank
Frodyma was in a position to interact directly with the Director of Personnel and OSHA's EEO
Office on EEO issues involving directorate employees. Over the years, Mr. Frodyma had a
number of EEO complaints filed against him. Mr. Goddard personally told me in November
2004, that he knew that I had an EEO case. As Director, he is in a position to interact with
others in OSHA who have information on EEO cases involving his employees. Mr. DuBois
was my supervisor when I filed my EEO complaint in 1998, he will be deposed in my civil
case, and he has knowledge of the EEO Reprisal Complaint I filed in 2000. Mr. Pitulej,
although new to my directorate (Attachment D), was briefed by his predecessor, Frank
Frodyma, on personnel issues before he left. He was also briefed by Clay Taylor, a Local 12
Union Representative of the directorate, on issues related to my 2004 appraisal and Mr.
Frodyma's decision to reduce my overall performance rating. He is industrious and, I believe,
he currently knows more about my EEO case and activities than anyone in the directorate. He
supported Mr. Frodyma's decision to reduce my overall rating from Outstanding to Highly
Effective, and the 90-day Performance Plan directed by the Personnel Office and subsequent
rating. He, like other managers, supported these actions even though they were in violation of
DOL Personnel Regulations.

So many years have expired since I filed my case in 1998. Therefore, many other managers
and employees have gained some knowledge of my case simply through word of mouth. In
addition, since June 1998, a number of OSHA managers and employees have gained
knowledge of my EEO case and activities because they have been involved with or impacted by
the processes. In 1999, the Justice Department interviewed and met with a number of OSHA
managers about my civil action. When I filed my EEO Reprisal Complaint in August 2000, a
number of managers were part of the investigation. In September 2000, a number of managers
and employees were identified and scheduled for depositions in my civil action. So far, I
believe, the settlement negotiations of my case have directly involved the Director and Deputy
Director of the Directorate of Administrative Program, the Director and staff of OSHA's Office
of Personnel, and the Office of the Assistant Secretary for OSHA. I also believe the top
management of my directorate is kept informed of all activity related to my case.

j.    *"How do you know that the reason for the rating was because of your previous
       participation in the EEO process?  Does some connection exist between your
       protected activity and the incident at issue?"*

**Response**:

In May 1999, I filed a Civil Action in U.S. District Court related to the Informal and Formal
EEO Complaints I filed with DOL in 1998.  This court case has been going on for more than
six years even though there was an agreement to settle in 1999.  In October 1999, the Justice
Department offered to settle the case before it went to trial.  OSHA delayed settlement by
raising objections to every solution proposed, even though their objections were unfounded.  In
May 2000, the Court was petitioned to continue discovery proceedings and to schedule trial.  In
September 2000, the Justice Department, again, offered to settle the case to include assigning
me to an IPA.  Over the next two years, preliminary agreements were established with two
different organizations to satisfy that part of the settlement agreement because OSHA insisted
that an IPA assignment be completed before it would proceed with any settlement.  In both
cases, OSHA delayed settlement by not responding to a related request for information until
both agreements had collapsed.  In either case, I believed, OSHA's response would have taken
less than two hours to prepare.  In October 2002, the Court was petitioned to restore
proceedings because settlement could not be reached.  In November 2002, the Justice
Department filed a brief stating that, in good faith, they would settle the case.  In 2003, a
preliminary agreement was established with another organization to satisfy the IPA part of the
settlement agreement.  Again, more than 1½ years, OSHA delayed settlement by not
responding to a related request for information.  The Court was petitioned again in October
2004 to restore proceedings because settlement had stalled.  In response to this petition, the
Judge initiated procedures to call a meeting of the parties.  Before the meeting could be
scheduled, OSHA responded in November 2004, by providing the requested information -- a
half page of typed information.  This response represented the first real progress in settling the
case and the second step toward removing the one obstacle that OSHA had consistently used to
delay settlement.  Now, OSHA had no reason not to move forward with settlement.  It should
be noted that, since November 2004, OSHA has taken no further action to finalize the

settlement agreement and has not responded to any inquiries from my counsel.

It was no coincidence that after OSHA provided information needed to move the settlement negotiations of my case forward in November 2004, OSHA management made the decision on December 1, 2004, to reduce my overall performance rating from Outstanding the previous years, to Highly Effective. It is my belief that OSHA management wants an excuse to renege on the settlement. Until November 2004, OSHA management had been successful in delaying court proceedings and negotiations. This time, however, I believe OSHA had no choice but to respond to the request for information. I further believe that the decision to reduce my rating represents the beginning of many actions that will be taken against me in an effort to force me to drop the case. My case involves some top level managers and settlement will impact personnel arrangements of my office and directorate. When Frank Frodyma made the decision and Joseph DuBois took the action to reduce my performance rating, they each had more than 15 years of experience as a manager or supervisor. They knew what they did violated DOL Personnel Regulations. When Mr. Frodyma left his position as Deputy Director, other managers were expected to continue to support the decision. Over an eight-month period (December 1, 2004 to July 27, 2005), OSHA developed three different appraisals that consistently rating my performance Highly Effective. Prior to December 1, 2004, my performance was consistently rated Outstanding. My performance in 2004 and 2005 was the same as my performance in 2001, 2002 and 2003. There were no meetings with me in 2004 or 2005 to tell me otherwise, nor was there an opportunity to improve.

k.   *"Did you discuss that you felt that the rating was because of your previous participation in the EEO process with anyone in management? If yes, with whom and what was their response?"*

**Response**: No.

l.   *"How do you know the agency was aware of your protected activity when the rating occurred?"*

**Response**:

In May 1999, I filed a Civil Action in U.S. District Court related to the Informal and Formal EEO Complaints I filed with DOL in 1998. This court case has been going on for more than six years even though there was an agreement to settle in 1999. In October 1999, the Justice Department offered to settle the case before it went to trial. OSHA delayed settlement by raising objections to every solution proposed, even though their objections were unfounded. In May 2000, the Court was petitioned to continue discovery proceedings and to schedule trial. In September 2000, the Justice Department, again, offered to settle the case to include assigning me to an IPA. Over the next two years, preliminary agreements were established with two different organizations to satisfy that part of the settlement agreement because OSHA insisted that an IPA assignment be completed before it would proceed with any settlement. In both cases, OSHA delayed settlement by not responding to a related request for information until both agreements had collapsed. In either case, I believed, OSHA's response would have taken less than two hours to prepare. In October 2002, the Court was petitioned to restore proceedings because settlement could not be reached. In November 2002, the Justice Department filed a brief stating that, in good faith, they would settle the case. In 2003, a preliminary agreement was established with another organization to satisfy the IPA part of the settlement agreement. Again, more than 1½ years, OSHA delayed settlement by not responding to a related request for information. The Court was petitioned again in October 2004 to restore proceedings because settlement had stalled. In response to this petition, the Judge initiated procedures to call a meeting of the parties. Before the meeting could be scheduled, OSHA responded in November 2004, by providing the requested information -- a half page of typed information. This response represented the first real progress in settling the case and the second step toward removing the one obstacle that OSHA had consistently used to delay settlement. Now, OSHA had no reason not to move forward with settlement. It should be noted that, since November 2004, OSHA has taken no further action to finalize the settlement agreement and has not responded to any inquiries from my counsel.

OSHA managers and supervisors are made aware of complaints filed by employees through informal channels of communications. Although they may not be informed of all the details of

each complaint, they are aware of the basic issues. In my 2000 EEO Reprisal Complaint Affidavit, I recounted my supervisor's statement that he was being provided with information on my case, including the decision to settle. So, it was no coincidence that after OSHA provided information needed in November 2004 to move the settlement negotiations forward, OSHA management made the decision on December 1, 2004, to reduce my overall performance rating from Outstanding the previous years, to Highly Effective.

The managers mentioned in this affidavit had some level of knowledge of my EEO case or activity. The Director of Personnel is a central figure in OSHA in the settlement negotiations related to my case because of the nature of the issues to be resolved. I believe he knows a great deal about my case. The personnel-related document that was produced by OSHA in November 2004 as part of my settlement negotiations was probably developed under the supervision of the Director of Personnel. In his position as Acting Director and Deputy Director of the directorate, Frank Frodyma, was in a position to interact directly with the Director of Personnel and OSHA's EEO Office on EEO issues involving directorate employees. Over the years, Mr. Frodyma had a number of EEO complaints filed against him. Mr. Goddard personally told me in November 2004, that he knew that I had an EEO case. As Director, he is in a position to interact with others in OSHA who have information on EEO cases involving his employees. Mr. DuBois was my supervisor when I filed my EEO complaint in 1998, he will be deposed in my civil case, and he has knowledge of the EEO Reprisal Complaint I filed in 2000. Mr. Pitulej, although new to my directorate (Attachment D), was briefed by his predecessor, Frank Frodyma, on personnel issues before he left. He was also briefed by Clay Taylor, a Local 12 Union Representative of the directorate, on issues related to my 2004 appraisal and Mr. Frodyma's decision to reduce my overall performance rating. He is industrious and, I believe, he currently knows more about my EEO case and activities than anyone in the directorate. He supported Mr. Frodyma's decision to reduce my overall rating from Outstanding to Highly Effective, and the 90-day Performance Plan directed by the Personnel Office and subsequent rating. He, like other managers, supported these actions even though they were in violation of DOL Personnel Regulations.

So many years have expired since I filed my case in 1998. Therefore, many other managers

and employees have gained some knowledge of my case simply through word of mouth. In addition, since June 1998, a number of OSHA managers and employees have gained knowledge of my EEO case and activities because they have been involved with or impacted by the processes. In 1999, the Justice Department interviewed and met with a number of OSHA managers about my civil action. When I filed my EEO Reprisal Complaint in August 2000, a number of managers were part of the investigation. In September 2000, a number of managers and employees were identified and scheduled for depositions in my civil action. So far, I believe, the settlement negotiations of my case have directly involved the Director and Deputy Director of the Directorate of Administrative Program, the Director and staff of OSHA's Office of Personnel, and the Office of the Assistant Secretary for OSHA. I also believe the top management of my directorate is kept informed of all activity related to my case.

3.    *"In your affidavit signed September 13, 2005, you state: "Initially, I had assumed that OSHA Management made a decision not to give me an award after my appraisal was processed. Much later in June or July 2005, other information entered in my People Power file indicated that OSHA Management canceled my award on December 1, 2004 (Attachment 9), the same day that management decided to reduce my overall performance rating. More important, the award was canceled before my performance appraisal was approved and processed as my final Rating of Record." Tab 9 also reveals that a Monetary Award was process on January 21, 2004. Please provide a copy (SF 50) of the award you received on January 21, 2004 and explain what the justification for the award was."*

      **Response**: Attachment O is a copy of the SF 50 in question.

4.    *"When you submitted your affidavit signed September 13, 2005, you also submitted 16 Exhibits. Among the Exhibits are the following:*

      *Exhibit Number 5: People Power Screen Print dated January 25, 2005*
      *Exhibit Number 8: People Power Screen Print dated January 31, 2005*
      *                          People Power Screen Print dated February 7, 2005*
      *Exhibit Number 9: People Power Screen Print dated July 5, 2005 (3 pages)*

*Please identify the source (i.e. the individuals name) of these documents. In order to determine whether the documents are accurate the source of these documents must be contacted to certify the authenticity of the documentation. "*

**Response**:

Ms. Jacqueline Gilmore, who is a trained and authorized "Initiator" of the People Power system, accessed my computer personnel file to help me answer the question as to whether OSHA management had or had not processed a performance award for me. Ms. Gilmore is a Program Analyst in the Division of Recordkeeping of my office, the Office of Statistical Analysis. According to Ms. Gilmore, she has authority to initiate a limited number of personnel actions in the People Power system, and only for employees of her office. She does not have authority to initiate actions related to performance appraisals or performance awards. Ms. Gilmore is the first link in the chain for personnel actions. Actions initiated by Ms. Gilmore as an "Initiators" may be approved by a second Initiator, and must be approved by the directorate, and the appropriate authorizing offices, the budget and/or personnel offices. Information from my computer personnel file provided the only official information I had on the status of my performance award. This information also confirmed the processing of my 2004 performance appraisal. OSHA management has never communicated with me regarding the performance award.

5.    *"Please submit any additional notes, physical evidence, or other documentation and provide an explanation as to the relevance of each item in relationship to the issues accepted for this investigation. "*

**Response**:

6.    *"Are there any persons who have relevant information? If yes, please provide his or her(s) name(s) and explain what relevant information regarding the issues in this matter you believe s/he may have. "*

**Response**:

Throughout my Affidavit, I have identified individuals directly involved in my case, and others whom I contacted for assistance or information. Of the latter group, Clay Taylor, Linda Copening and Jacqueline Gilmore, work in the Francis Perkins Building at 200 Constitution Avenue, N.W., Washington, D.C. 20210. Ms. Copening, however, is currently on sick leave. I will provide relevant contact information for Ms. Copening when it becomes available.

*Complainant Questionnaire*
*Case Nos. 04-05-031, Celeste Davis, Complainant*

I have reviewed this statement, which consists of ████████, and hereby solemnly ████████████ that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential, will become a permanent part of the record of investigation, and may be shown to any necessary party.

_____     _____
_Edna L. Vance_                                              _October 17, 2005_
                (Signature of Affiant)                                      (Date)

Signed before/received by me at (Street and City) _____

on this _____ day of _____, 20_____

_____
                (Signature of Investigator)

CRC Form 10
Rev. 3/03

┌─────────────────────────────┐
│ Exhibit;    F-1          │
│ Page 11⁴ of 11⁴ Pages    │
└─────────────────────────────┘



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

 CLICK HERE TO PRIN

For Immediate Rele
Office of the Press Secre
December 28, 2

# National Day of Mourning for President Gerald R. Ford
A Proclamation by the President of the United States of America

📄 Remembering President Gerald R. Ford (1913-2006)

As a further mark of respect to the memory of Gerald R. Ford, the thirty-eighth President of the United States,
NOW, THEREFORE, I, GEORGE W. BUSH, President of the United States of America, by the authority vested i
me by the Constitution and laws of the United States, in honor and tribute to the memory of Gerald R. Ford, and
as an expression of public sorrow, do appoint Tuesday, January 2, 2007, as a National Day of Mourning
throughout the United States. I call on the American people to assemble on that day in their respective places of
worship, there to pay homage to the memory of President Ford. I invite the people of the world who share our
grief to join us in this solemn observance.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty eighth day of December in the year of our
ord two thousand six, and of the Independence of the United States of America the two hundred and thirty-first.

GEORGE W. BUSH

# # #

**eturn to this article at:**
tp://www.whitehouse.gov/news/releases/2006/12/20061228-2.html

CLICK HERE TO PRINT

COPY

RECEIVED
U.S. DISTRICT COURT    *to return*
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEC 33  PM 5: 50

NANCY M.
MAYER-WHITTINGTON
CLERK

EDNA L. VANCE,                                  :
6605 – 16th Street, NW               :
Washington, DC  20012                           :
                                                :
         Plaintiff                              :
                                                :
                                                :
v.                                              :
                                                :
                                                :
ELAINE CHAO, Secretary                          :    Civil Action No. _____
         U.S. Department of Labor,              :
200 Constitution Avenue, NW                     :
Washington, DC  20210                           :
                                                :
                                                :
         Defendant                              :
                                                :

---

## COMPLAINT
### (Discrimination in Employment, Retaliation)

Plaintiff, EDNA VANCE ("Plaintiff"), brings this action pursuant to Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII") to

redress deprivation of rights secured by federal law which prohibit discrimination and/or

retaliation against federal employees because of one's race, color, age, gender, or prior

EEO activity.

### JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 42 U.S.C. §2000e-5(f)(3).

2.      Plaintiff was, at the time of the retaliation, working in Washington, D.C. at

the National Office of the Defendant Agency.  Accordingly, venue properly lies with the

United States District Court for the District of Columbia.

**CIVIL COVER SHEET**

COPY

to return

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Edna L. Vance | Elaine Chao, Secretary, U.S. Department of Labor |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **11001**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Lisa Smith Sanders, Esq.
Sanders & Sanders
14452 Old Mill Road, Suite 101, PO Box 1429
Upper Marlboro, MD  20773
(301) 574-1338

ATTORNEYS (IF KNOWN)

U.S. Attorney for the District of Columbia
Civil Section, Room 10-812
555 Fourth Street, N.W.
Washington, D.C.  20001

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ● 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff))
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)**   OR   **○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

**L. Norman Sanders**
l.norman.sanders@sanderslawfirm.net
**Lisa Smith Sanders**
lisa.sanders@sanderslawfirm.net
*Admitted to Practice in:*
*Maryland*
*District of Columbia*

January 2, 2007

Clerk of the United States District Court
     For the District of Columbia
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

     Re:    Vance v. Chao,

Dear Madam Clerk:

    Please find enclosed for filing in the above referenced case an original and two copies of the following:

    (a)    Civil Cover Sheet
    (b)    Complaint
    (c)    LCvR 7.1 Disclosure
    (d)    Summons for Defendant Elaine Chao, U. S. Attorney General, and U.S. Attorney for the District of Columbia
    (e)    $350 filing fee for civil complaint

I have also enclosed a CD-ROM with the referenced documents in .pdf format.

    Please return the executed summonses to this office for processing. Please call with any questions you may have.

              Sincerely,

              Lisa Smith Sanders, Esq.

LSS/idm
enclosures